1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

Neida Cruz, Mirta Cruz,      *      Civil Case 17-CV-02959 (JAG)
Carlos Moises Cruz

    Plaintiff             *      Jury Demand

Vs                           *

Hospital Episcopal San Lucas*
y et, als

    Defendant             *

***************************

DEPOSITION TAKEN OF

DR. JOSE RAMON ORTIZ FELICIANO

At the offices of Roberto Ruiz Comas located at Piso 8, Doral

Plaza,Hato Rey, PR on May 2, 2018 at 10:00 AM

*(...) Audio Ininteligible*

**Carlos Bolívar Guillén**
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                         2


APPEARANCES


FOR THE PLAINTIFF

Atty. Michelle Ramos Jimenez

Atty. Diego Ledeé Bazan


FOR THE DEFENDANT

Atty. José Goyco Amador – Dr. Aurelio Collado

Atty. José Gonzalez Villamil – San Lucas Home care

Atty. Roselis Siena Malave – Dr. Aurelio Collado

Atty. Mayra Estrella – Hospital San Lucas

Atty. Roberto Ruiz Comas – Dr. Guillermo Bolaños

Atty. Hector Vivas – Dr. Aurelio Collado


NOTARY PUBLIC

Atty. Diego Ledeé


COURT REPORTER

Ileana Guillén

CARLOS BOLIVAR GUILEN
Violeta GG 10
Borínquen Gardens
San Juan, PR 00926
787-720-2365

ATTY. ESTRELLA:

Good morning to all we are here today May 2, 2018 for the deposition of plaintiff expert witness Dr. Ortiz Feliciano.  The case for which we are here present are Neyda Cruz vs Hospital Episcopal San Lucas Civil number 17-02959.  This case is filed in the district court for the Federal District of Puerto Rico and we also have a case filed at the First Instance Court of Ponce Asuncion Santiago Cruz vs Hospital San Lucas Civil number JVP 2016-0369.  I am Atty. Mayra Estrella on behalf of Hospital Episcopal San Lucas Ponce.  Please everyone here present identify themselves for the record.

ATTY. VIVAS:

Good Morning to all.  My name is Jose Hector Vivas and I represent Dr. Aurelio Collado who is present today.

Atty. RUIZ COMAS

good morning my name is Atty. Roberto Ruiz Comas and I represent Dr. Guillermo Bolaños.

ATTY. GONZALEZ VILLAMIL:

Good morning.  Atty. Gonzalez Villamil om behalf of San Lucas home care.

ATTY. GOYCO:

José Goyco Amador representing Dr. Collado.

ATTY. SIERRA:

Atty. Roselis Siena Malave, Also representing Dr. Aurelio Collado.

ATTY. RAMOS

Good morning Counsel Michelle Ramos representing plaintiff in civil case 16-2959.  The case pending in the Federal Court.

ATTY LEDEE:

Buenos días, Lcdo. Diego Ledeé Bazán abogado de la parte demandante en el caso de Puerto rico.

ATTY. ESTRELLA:

Before opening the record the parties have stipulated the following stipulations.  The objections of the deposition are not going to be waived except those of form that shall be raised today.  Other objections are going to be reserved for trial.  The deponent will receive a copy of the deposition through plaintiff attorney and will have 30 days to verify the transcription.  If no objection is raised during that period the deposition is going to be deemed correct and the deponent is going to decline the signature.  Also, to take the oath of the deponent and the stenographer Atty. Diego Ledé is going to act as Public Notary and after that he is going to continue with the legal representation of plaintiff in this case.  Any other stipulation that we have to state for the record?

ATTY. RAMOS:

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                        5

I think that is all.  Counsel for plaintiff we agree on the stipulations.

ATTY. ESTRELLA:

If we can take the oath right now please.

ATTY. LEDEE:

Buenos días.  Por favor le pedimos a la señora taquígrafo que levante su mano derecha y nos diga su nombre.

TAQUIGRAFA

Ileana Guillen.

ATTY. RAMOS:

Tiene que ser en inglés.

ATTY. LEDEE:

Pues si es en inglés yo no la puedo tomar entonces.

ATTY. VIVAS:

La podemos traducir.

ATTY. RAMOS:

Nosotros no vamos a objetar el juramento pero ustedes que son los demandados tienen que estar de acuerdo que no van a objetar este juramento.

ATTY. VIVAS:

We Will add to the stipulations that there is no objection that the oath be taken in Spanish.

ATTY. RAMOS:

Do we all agree to that stipulation?

*(...) Audio Ininteligible*

*Carlos Bolívar Guillén*
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

6

ATTORNEYS:

Agreed.

ATTY. RAMOS:

We can take the oath.

ATTY. LEDEE:

Pedimos a la señora taquígrafa que levante su mano derecha y nos de su nombre completo.

COURT REPORTER:

Ileana Guillen.

ATTY. LEDEE:

¿Jura usted tomar y transcribir fielmente la deposición que tomará lugar durante la mañana de hoy?

COURT REPORTER:

Sí, lo juro.

ATTY. LEDEE:

Gracias.    ¿Por favor el señor deponente nos da su nombre completo?

DEPONENT:

José Ramón Ortiz Feliciano.

ATTY. LEDEE:

¿Jura usted decir la verdad y nada más que la verdad de lo que sepa y se le pregunte con relación a la deposición que tendrá lugar durante la mañana de hoy?

DEPONENT:

Así lo juro.

ATTY. ESTRELLA:

Deponent please state your full name for the record?

R    José Ramón Ortiz Feliciano.

Q    Doctor we all know or at least I know that you have been in a deposition before?

R    Yes.

Q    So you already know how this procedure is going to be taken?

R    Yes.

Q    But anyway I am going to clarify some details. We are going to ask you some questions about your expert report and about your background as a physician and if at any moment you don't understand a question that we poise to you just let me know so we can rephrase the question until you can answer it. If we ask you a question that calls for an answer of yes or no please answer it in that way.  If you cannot answer it in that way please let us know until we can finally have an answer to the question. Doctor where do you live?

R    I live in Luquillo Puerto Rico, Paisaje del Lago F-7.  I have lived there for the last 20 years.

Q    What is your last business address?  Do you have an office?

R    I have a home office in my house and I have an office at Edificio Medico del Este, Avenida General Valero

303 Fajardo Puerto Rico.

Q    When you say you have a home office what do you do at your office in your home?

R    Study, review records and prep for currently I am prepping of the Board.

Q    So you are planning to take the boards of surgery?

R    Yes.

Q    When?

R    I am planning to take in September it is called the Review at Columbia Presbyterian Hospital and after that I will decide when I take the board.

Q    Since when do you have the office at the Edificio Medico del Este?

R    I think it is around 1983 or 1984.

Q    Doctor, about your education I have here that you had your bachelor's degree in General Science at the University of Puerto Rico.  You finished in 1972 and you went to the med school at the UPR?

R    Yes.

Q    And you finished that degree in 1976?

R    Yes.

Q    During your years as a medicine student do you have any, did you obtain any honors or prizes?

R    No.

Q   Did you perform any investigations during your degree as a medical student?

R   As a Medical student?

Q   Yes.

R   I was doing Biological Substance for Introduction of Submolecular Particles. That was in quantitative chemistry but I didn't finish that because I went to med school.

Q   So that one is not mentioned here on the page 2 of your Curriculum Vitae?

R   No.  My daughter is finishing it now.

Q   And I didn't ask you before for the record but I have here your Curriculum Vitae I want you to look at it and tell me if this is the version…

R   There is no significant change.

Q   When you say that there is no significant change can you tell me if there is any change at the moment other than that?

R   No change.

ATTY. VIVAS:

Can we add this as an exhibit?  Do you have an extra copy?

ATTY. ESTRELLA:

I don't have an extra copy.  I have the one Atty. Ramos sent us by email.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                              10

ATTY. RAMOS:

Esta en tu email.

ATTY. VIVAS:

I wanted it to be part of the…

ATTY. ESTRELLA:

Please review this Curriculum vitae that we are going to include as an exhibit of the deposition.

R    Yes.

Q    We can include this as exhibit 1 of the deposition.    Doctor, also about your education you have here that you went to Memorial Hospital Chapel Hill North Carolina as an Acting Surgical Intern and you went there for how long?

R    Two to three months.

Q    And that intern was part of your MD degree.    You had to complete that intern?

R    No it was, I requested it.    it was in addition to.

Q    So it was not a requisite of your MD degree?

R    No.

Q    And as an acting surgical intern what did you do during those two or three months that you went there to Memorial Hospital?

R    I did all the work of a surgical intern.

Q    Also, I didn't ask you during your MD degree did

you receive any fellowship?

R   What do you mean by fellowship?

Q   Scholarship.

R   I had a scholarship, an honor scholarship. And a governor's scholarship.

Q   That was during your MD Degree?

R   Yes.

Q   And then I have here that you started your residency at University Hospital in Centro Médico from 1976 to 1981?

R   Yes.

Q   And these took you five years, the residency?

R   Yes.

Q   And it also says here that you went to Henry Ford Hospital in Detroit, Michigan?

R   Yes.

Q   Why did you went to Henry Ford Hospital?

R   I wanted to do a Peripheral Vascular fellowship.

Q   But you went there for two months correct?

R   Dr. Salagi said I didn't have to do, I was wasting my time.

Q   So at this moment you don't have a certification as a Peripheral Vascular surgeon?

R   I qualify under the grandfather clause because the fellowships came into view on 1984 and the first Board

for Peripheral Vascular was in 1991.

Q    But even thought you qualified under the grandfather clause you don't have the certification?

R    I never asked for it.

ATTY. GONZALEZ VILLAMIL:

And you would be able to ask for it now right?

R    Yes, I can.

ATTY. ESTRELLA:

Q    And it says here that you were a visiting physician during those two months at the Henry Ford Hospital.  What does a visiting physician does?

R    Everything the rotating surgeon does through vascular.

Q    At this moment that sub specialty it has, right now there is a sub specialty on the Peripheral Vascular surgery that requires additional time of study, correct?

R    Most of the fellowships are two to three years and it started in 1991.

Q    So at this moment for a surgeon to become a Peripheral Vascular surgeon you have to study for two or three years, additional two or three years after completing the residency in surgery?

R    That is an interesting point.  The Peripheral Vascular says that you have to show proficiency in Peripheral Vascular and they let you take the board.  One

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                                            13

of the most renowned Peripheral Vascular surgeons is Dr. Rob and he has the bar and he never trained for Peripheral Vascular.

Q   Will he qualified under the grandfather clause correct?

R   He showed proficiency in Peripheral Vascular. And one of the ways that you can show proficiency is by presenting letter from people who are Board certified that you are proficient and showing your caseloads.

Q   So at this moment you consider to have a specialty in that area even though you don't have a certification as a Peripheral Vascular surgeon?

R   Yes.   That is why I am planning on taking the review board.

Q   About your teaching…

ATTY. RUIZ COMAS:

The boards that you are planning to take are the boards of the peripheral surgery or are the boards for Peripheral Vascular surgery?

R   I am taking both.  But since I have bene, since I graduated I have been doing surgery. I have been doing periphEral I have to show proficiency. I have the letters. But they want, the American Board of Surgeons require people that have been a long time out to take what is called a review board.   It is not, it used to be a two

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                          14

part now it is just a written examination.

Q   So in fact what you are telling us is that because of the requirement of the American Board of Surgery you are now required in order to be Board certified in Peripheral Vascular surgery take a review board?

R   If I want to take the board for the Peripheral Vascular I have to take the review first.

Q   And that is a written examination?

R   It is a written examination,.

Q   Before it used to be written and oral?

R   it used to be written, oral and practical.

Q   Now you only need to take the written examination in order for you to be certified as a peripheral surgeon?

R   They have broken down into two parts.  You have to take the SESAP that is what I am taking now.  You have to finish the SESAP and then most, if you have spent the last ten years you doesn't have to take the review but I have to present my caseload over the last ten years and take the review.  That opens up that I can go to take the American Board of Surgery and the Peripheral Vascular Board.

Q   And do you have a written letter by anyone stating that you have the caseload and that the caseload that you sent to them suffices enough for you to take

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    15

those boards?

R   No, you have to do that after you take the SESAP.

Q   And the SESAP is what?

R   SEPSAP is a training program that American Board of surgery set up for all persons conductive to taking the American Board of Surgery.

Q   So you have to take like a, is it a course?

R   It is about a year and a half course, you can do it over the computer, but you do have to go in two times. It is computer and a series of examinations.  You start it off and when you finish they will give you a final, they give you ongoing exams.  When you finish it they will tell you.  After I take the SESAP then I can ask the hospitals I can, it has to be official, basically like a transcription from the university descending all my caseloads.  And I have to send like all the university cases I have been.  And basically, they are looking that you have done like a surgery that they are looking at. They will look at that and then since I have been more than ten year since I finished surgery, they want people like me to take a review course. Either people like me or people who come out of surgical programs out of the United states have to take a review examination.

Q   But let me, you are giving me too much information and I want to be clear.  You are currently

taking the SESAP?

R   SESAP.

Q   You haven't finished that yet.

R   No.

Q   How many more tests do you need to do or how many more on line courses do you need to do in order for you to be granted a SESAP?

R   I should finish the SESAP in about a year.

Q   Once you pass the SESAP then you request the hospital where you have worked at to send to the American Board of surgery the caseload of cases that you have done concerning Peripheral Vascular surgery and general surgery?

R   No.  Then I request the review board.  The review board is a written examination.

Q   So you take a written examination by the Review Board?

R   Yes.  American College of Surgeons.

Q   Once you pass that one then you need to send them the caseload?

R   Still. Then I take the Board then after that if I want to be a fellow I present my…

Q   Oooh.

R   I pass the exam plus my, I can either send the caseloads I have had or I can send from persons of

renowned who are board members fellows that they know me that I had this caseload.

Q   So in other words as of today you are not a fellow of the American Board of Peripheral Vascular Surgeons?

R   No.

Q   And as of today you are not a fellow of the American Board of Surgery?

R   No.

Q   Thank you very much.

ATTY. ESTRELLA:

Q   Doctor, regarding you teaching appointments it is correct that your teaching appointments finished in 1998 correct?

R   Yes.

Q   And that last one which is associate professor of surgery at José Ramos Lebron Hospital In Fajardo was not for surgeons correct?  It was for family medicine?

R   Family physicians.

Q   Family physicians. Doctor, do you have an active license to practice medicine in Puerto Rico?

R   Yes.

Q   What is the number?

R   6201.

Q   Do you have an active license to practice

medicine in any state?

R    No.

Q    Also have in your curriculum vitae some hospital appointments that you had and I noticed that the last one was until 1986?  Is that correct?  In which you were the Director of the Department of Surgery in Hospital José Ramos Lebron?

R    That was in one of the multiple manifestations of the Fajardo Regional Hospital.

Q    But the last appointment that you mention here in your curriculum vitae was until 1986?

R    Yes.

Q    After that, so these appointments were from 1981 to 1986?

R    No.

Q    No?

R    No, 1981 I was in Mayaguez finishing my OS and then I came to Fajardo.

Q    This one was from 1983 to 1986.

R    Yes.

Q    And after that 1986 did you have privilege in any hospital to…

R    Yes.

Q    …do surgery?

R    Yes.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

19

Q   As of today in what hospital do you have privileges to perform surgery?

R   Currently in Humacao, Hima San Pablo and in Caribbean Medical Fajardo.

Q   And the privileges that you have in Hima Humacao are to perform surgery and Peripheral Vascular surgery or just general surgery?

R   Surgery in Peripheral Vascular.

Q   And at Caribbean Medical in Fajardo?

R   Surgery in Peripheral Vascular, minimum invasive in both.

ATTY. RUIZ COMAS:

Q   You say you have the privileges at Caribbean?

R   Yes,

Q   Currently? There have been no proceedings against you in Caribbean?

R   Yes.

Q   At the present time?

R   Yes, the court gave me back the procedures.

Q   When?

R   April 4 and they accused the hospital of *desacato*.

Q   April 4 of this year?

R   Yes.

Q   And do you have that decision there?

R    Yes.    I  can  send  you  a  copy. Accused  exactly *temeridad* and *desacato*.

Q    Who is accused?

R    The hospital.

ATTY. ESTRELLA:

Q    Just to be clear for the record, what happened in Caribbean in Fajardo?  Your privileges were suspended?

R    Suspended.

Q    For what reason?

R    They presented two cases that I operated on and they said that it was a danger to the patient. I proceeded to take them to court. I asked initially for an injunction, the judge gave me injunction, they requested a review of that. Judge said no way. I sent patients to be admitted they refused them. Then the judge gave us an emergency… he gave, told them that they had to comply with the order.

Q    And at this moment you have the injunction or do you already, did you went to an administrative procedure?

R    I had asked for an administrative procedure and they had never given to me.  That was one of the reasons that the judge said they couldn't go back now.

Q    But after the, they resolved the injunction did you receive your administrative procedure?

R    I don't have to go.  In their appeal they said

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018
21

they were repressed and I go to the administrative procedure and I presented that I had tried. The judge says once decided the specific case he said the hospital has to be the first to deal with their bylaws and follow their bylaws and that the hospital had not followed their own bylaws. The hospital said that they were not by laws. That it was not a contract between the parties. That it was an agreement. And the judge said that that had been already discussed at the superior court level. So that that was contracted.

Q   And is that case right now is an appellative procedure?

R   They asked for emergency view from the appellative and they haven't received an answer.

Q   So the case is still at the appellative court?

R   No. The appellative court has not assumed jurisdiction. Cersiore, they asked for that and the court has not… it was approximately two months ago.

Q   Then for how long were you privileges suspended at Caribbean Medical Center Fajardo?

R   Between… Like six months.

Q   Because of other suspensions that have been taken from you, I know that you have had a suspension in a hospital in Fajardo years ago correct?

R   Yes, but that is not in the data bank or

*(…) Audio Ininteligible*

*Carlos Bolívar Guillén*
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                  22

anything.  Since it has always been asked I went and got a copy of the 2003 data bank that says that it is clear and it does not appear in the federal system or in Puerto Rico.  Here you have it.

Q    What I want to know about that summary suspension is basically for how long you were suspended in that occasion?  It was the hospital… what was the name of the hospital?  Hima?

R    It was at that time…  It wasn't Hima.  It was San Pablo.

Q    And for how long were you suspended?

R    It has never been cleared up.

Q    I understood that from previous depositions, but what I want to know for how long you were not able to go to the hospital?

R    I never went back.

Q    But after the summary suspension I know that when the court decided the legal procedure that you took the hospital was already sold.

R    After I started the procedure six months into the procedure the hospital ceased to be.

Q    So in that occasion you were six months, I am not going to use the word suspended because you are going to again explain to me what says that data bank, but you were not able to take patients to the hospital.

*(…) Audio Ininteligible*

*Carlos Bolívar Guillén*
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    23

R    I was out 30 days but I never went back.

ATTY. RAMOS:

For the record Atty. Michelle Ramos I am sending you what has been sent by Dr. Ortiz Feliciano yesterday regarding the decision of the Humacao Court regarding the privileges, Fajardo regarding the privileges of Dr. Feliciano.  The order and the contempt order also and the preliminary injunction that was actually granted.

ATTY. ESTRELLA:

Q    And do you have also there the (.)

R    I have it here if you want copy?

ATTY. RAMOS:

What he has… No.

ATTY. ESTRELLA:

Q    Also on your curriculum vitae there are some publications and presentations.  I just want to know. I have a previous curriculum vitae that I received of you in another case and I noticed that you added two additional, I don't know if they are publications or presentations, four and five.  So from what years are these two, Microsurgery Model for Carotid Surgery and the Current study use of AV Fistula.

R    I did those in the University of Puerto Rico Laboratory, Vascular.

Q    In what year?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                                      24

R    That was in my final year.  1981.

Q    So all the presentations and publications that you have listed here in your curriculum vitae are from 1981?

R    Yes or prior.

Q    Are any of these five a publication?  Because I am not clear which ones are publications and presentations.  The first one Povidone-Iodine…

R    The was a publication on surgical gynecology and obstetrics.

Q    And the second one for Acute Peritonitis?

R    That was a publication, yes.

Q    And the third one is a presentation, correct?

R    Yes.

Q    And the other ones are investigations or also publications?

R    They were internal publications from the University of Puerto Rico.  I think that is called… I don't remember the name of the surgery.

Q    Doctor, regarding your career as an expert witness at what year did you start to act as expert witness in medical malpractice cases?

R    I would say it was shortly after 1996.  Something like that.

Q    We received copy of the cases that you evaluated,

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                            25

I want to show it you.  I want to know from years is that list that we have?

R   This is it basically.

Q   All the cases that you have worked as an expert witness?

R   That I have evaluated or…  Yes.

Q   And is this list updated?

R   They just need three cases more.

Q   And when it says there that these are the cases that you have evaluated it means that you have not rendered a report in all of them?

R   In most cases I rendered a report.

Q   So you don't have there included the cases in which you have evaluated the case and decided not to render a report?

R   No.

ATTY. RUIZ COMAS:

Doctor, in the list that you produced it seems to me that the last case that appears in that page is from 2016. So you have an updated version of this list which includes the cases that you have been evaluating and rendering reports in 2017?

R   Yes, I can send them to you.

Q   You can?

R   Yes.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    26

Q    You have those?

R    Yes.

Q    Because at least you have two with me. With me you have two.

ATTY. RAMOS:

For the record I sent them email yesterday and I specified that this was not up to date because that was a list that I had on my documents.

ATTY. RUIZ COMAS:

There Is no problem.

ATTY. RAMOS

Just to be clear that there are other cases that are not included there as a specified on my email.

ATTY. RUIZ COMAS

That's fine.  What we need is for him to produce a list of the cases updated until today.

R    Okay.

Q    ThaNk you.

ATTY. ESTRELLA:

Q    Doctor, in how many cases have you went to trial if you can remember?  Let's ask you this way.  In how many cases have you testified in federal court as an expert witness?

R    At the federal court I remember two cases.  And one I testified as a witness de *ocurrencia.* Two of them as

an expert witness.

Q   And those cases were with what judge, if you remember?

R   One was, she used to be the presiding judge Aida Delgado and I think I don't remember the other one.

Q   Do you know the final outcome of those two cases?

R   The attorney prevailed.

ATTY. RUIZ COMAS:

Which attorney.  The defendant attorney?

R   No.

Q   You say attorney prevailed but whose attorney.

ATTY. ESTRELLA:

Q   Doctor have you ever been sued for medical malpractice?

R   Yes.

Q   How many times?

R   Currently it is now 22.

Q   And do you have any active case of medical malpractice?

R   There are two that are active.

Q   And can you explain to us that two cases are about what?  What are the allegations against you in those two cases?

R   One case I inherited the case, who had a staph infection. He was admitted to my name. I did not authorize

that. He was admitted to my name. I saw the patient I discharged him told him that I did not authorize that admission and subsequently he sued me because I told him that he had to continue his treatment in an ambulatory fashion but he decided to go to another hospital and was admitted and he sued me.  That is an ongoing case.

Q   And what happened to that patient?

R   He is okay.  There is no problem with him.  He had a staph infection right buttock.

Q   And the other case?

R   The other case currently has not started.  That case is an intestinal obstruction that I operated on the case.  He went home no problems, but subsequently he sued me because he considered that he could have been treated medically.

ATTY. RUIZ COMAS:

Q   You say that that case has not started?

R   Not started.

Q   You mean by that that the case has not been filed yet?

R   It has been filed but it is not in the court yet.

Q   It is an ongoing case?

R   Yes.  Those are the two ongoing cases.

ATTY. ESTRELLA:

Q   And do you remember the name of plaintiff

attorneys in those cases?

R   One is there from Rio Piedras. I don't remember the name right now. But I can get the name of the attorneys.

Q   The name of those two.

R   Yes.

Q   If you think you can provide that to plaintiff attorney also?

R   Yes.

Q   And right now you are insured with what company?

R   CNA.  I have to renew it now.  They just sent me the renewal.

Q   Since when have you been insured with CNA?

R   Last two years.

Q   And before you obtained your insurance with CNA you were insured with what company?

R   Simed.

ATTY. RUIZ COMAS:

Q   Doctor, who is representing you in those two cases?

R   Igor Dominguez.

Q   For CNA?

R   No, these aren't under CNA.

Q   Whose?

R   They were under SIMED and I think one was under

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                          30

Puerto Rico Defense that I had one year.

Q   So the two cases that you have…

R   Are not by CNA.

Q   Are not by CNA?

R   No.

Q   Doctor, in those 22 cases that you said that you have been sued, how many of those cases have the insurance company settled the case or you have settled the case?

R   I settled one case in 2001 for $2,000 it was a business decision. And I settled another case in 2010. That's it.  That was $90,000.00

Q   And so if we request from you that you provide us your last national practitioner databank report, that report should reflect those two cases that have received payment from you in those cases you were sued?

R   Yes. I imagine so. Because this one reflects, the one I have here reflects the $2,000.

Q   And that was issued when?

R   This was in 2003 when I asked for it.

Q   So could you request that from the national practitioner data bank?

R   Yes.  I can request it. They tend to…

Q   We are going to give you 30 days.

R   No, they will never get it here in 30 days…

Q   Can you let me finish.  We are going to give you

*Carlos Bolívar Guillén*
*(...) Audio Ininteligible*        Traductores y Taquígrafos
787-720-2365

30 days.  If either of both attorneys request more time w

have no problem with that.

ATTY. RAMOS:

The list of the cases he has worked as expert witness

and the national practitioner data bank…

ATTY. RUIZ COMAS:

The current national practitioner data bank report.

ATTY. ESTRELLA:

And the name of the plaintiff attorneys for those two

cases that are ongoing for medical malpractice.

Q   Doctor in what day were your services retained in
this case?

R   I don't remember exactly.

Q   Do you remember who retained your services in
this case?

R   Diego Ledé.

Q   How many reports have you rendered in this case?

R   I rendered an initial report and I rendered tis
report on August 6, 2016.

Q   Do you still have the initial report that you
rendered?

R   That is a working document.  I don't remember.

Q   Doctor, who assisted you in the preparation of
the expert report in this case, if anyone?

R   Excuse me?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    32

Q    Who assisted you in the preparation of this…

R    Nobody.

ATTY. RUIZ COMAS:

Doctor, let me be clear.  This is the august 6, 2016 report?

R    Right.

Q    What you are telling us is that you prepared, previous to this report, you prepared another report?

R    A working document.

Q    But you didn't say that when she asked you.  You said a report.

R    It is a report but it is a working document.

Q    And do you remember what was the difference between that first working document report and this one?

R    That is kind of stretching it.  Basically, no.

Q    Did you submit that report to Mr. Ledé?

R    I sent that by email, basically.

Q    So you did submit that to him?

R    As an email.

Q    That's fine.  So he should have that copy of that email that you sent Mr. Ledé containing your preliminary opinions of the case?

R    I imagine so.

Q    So we are going to ask Mr. Ledé to provide us… Do you have that Mr. Ledé?

ATTY. LEDE:

Seguro.  Si lo tengo lo proveo.

ATTY. RUIZ COMAS

Ten days is enough?

ATTY. LEDE:

Yes.

ATTY. ESTRELLA:

Q   Doctor, this report of August 6, 2016 is your final report on this case?

R   I have been asked to review recently some paperwork from the nursing home.

Q   So, but you already reviewed that paperwork that you mentioned?

R   Yes.

Q   And after that you don't have any amendment to this report or do you have an amendment to the report of August 6, 2016?

R   No.

ATTY. RUIZ COMAS:

When you say that you don't have an amendment is that the contents of this report is not going to change?

R   I don't perceive them changing.

Q   And when you told Ms. Estrella that you had been recently given additional documentation regarding the home care I can understand from your answer that that review

did not prompt you to make any further amendments to this report?

R There is no change up to now.

ATTY. ESTRELLA:

Doctor, you have already told me that you have privileges to do surgeries in two hospitals.

R Yes.

Q What kind of surgeries do you mostly perform?

R I do mostly head and neck, cancer, GI, minimal invasive and in Humacao I do Peripheral Vascular.

Q Just in Humacao?

R Yes. Set-up is not adequate in Caribbean.

Q Have you treated as a surgeon, patients with recurrent hernia like in this case of Mr. Juan Carlos?

R Yes, I have been referred multiple cases.

Q When was the last time that you had a patient in which you repaired a recurrent hernia?

R I did one approximately 7 months ago. Let me see if I have pictures.

ATTY. RUIZ COMAS:

That is the picture of another patient. You cant show that.

DEPONENT:

Es de la operacion.

ATTY. ESTRELLA:

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                    35

Q    In preparation of this expert report did you interview or speak with any of the plaintiffs in this case?

R    I asked some questions to the wife when she originally took the records to my office.

Q    Do you remember what questions did you…

R    Basically I just asked what happened to have a grasp of what happened.

Q    What did she tell you?

R    That he had been operated.  That after the surgery he had returned to the hospital.  That after the hospital he had started with discharge of the abdomen.  That that was a long-term thing.  That after that he was discharged with, he couldn't eat and he returned to the hospital and he died.

Q    And you just spoke to the wife. You did not speak to any other plaintiff of this case?

R    No.

ATTY. RUIZ COMAS:

Have you received any written summary of the events that occurred in this case?

R    No. I would have written it down.

Q    My question is if you have received any documents…

R    I would have included it.

Q   Did you, in your report I see that you have five items that you have evaluated.

R   Yes.

Q   Were you provided prior medical records of the patient before 2015?

R   They were requested.

Q   They were requested?

R   By me.

Q   And they haven't been provided to you?

R   The office records of Dr. Bolaños no.

Q   Of the other hospitalizations.

R   No.

Q   You have requested any prior documentation before 2015 and the attorneys have not provided to you that information or that documentation?

ATTY. RAMOS:

Objection to the form.

R   I requested the office records. I requested the nursing home records. That I received recently. I received that and I reviewed and I have not added that I reviewed it.

ATTY. RUIZ COMAS:

Q   Were you aware that he had been hospitalized before?

R   Yes.

Q    And those records have not been produced to you?

R    No.

ATTY. ESTRELLA:

Q    So at this time you have not reviewed any medical record of this patient at Dr. Bolaños offices?

R    No.

Q    And also you don't have any medical record or information regarding the previous surgery to repair the hernia on this patient?

R    No.

Q    Doctor, did you use any medical literature to render your opinion in this case?

R    Yes.

Q    What is the medical literature that you used?

R    I used Current problems in Surgery. That is a textbook of surgery by Saviston. I used literature on incision of hernia. I can provide them. It is easier for me to send them to you.  I used also one on the Phasix mesh used. One on the characteristics of mesh. I have them all. I can send them to you.

Q    But you don't have the medical literature listed on your report, correct?

R    No.

ATTY. RUIZ COMAS:

Q    Did you use those excerpts of those textbooks or

articles in order for you to provide this report?

R    To confirm.

Q    So once you reviewed the case you went into those publications, read about them and those publications confirmed your opinion regarding the standard of care?

R    Yes.

Q    So we need those.  And since we don't have them it might be possible that we need to review those and depose you if we need to do so.  Because that is information that you have just told us that you used in order for you to provide your report.  How many textbooks?

R    Basically magazines.  Medical literature.

Q    Did you use online reference?

R    Mostly I have the literature online.

Q    So the literature that you reviewed you reviewed it on-line?

R    Yes.

Q    Did you review any up to date…

R    It is up to date.

Q    No, no. There is an online service that is called up to date in medicine?

R    No.

Q    You did not use that?

R    No.

ATTY. ESTRELLA:

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

39

I don't think I have any other questions about doctor's qualifications. Do any of you have questions regarding that matter?

ATTY. GONZALEZ VILLAMIL:

Q    Doctor is any part of your report based exclusively in what the patient's widow told you?

R    No.

Q    We are clear that you did not review the home care record before writing this?

R    Yes.

Q    Do you have any specific training in non-medical home care health services?

R    No.

Q    Do you know if there is any specific entities that establishes the standard of care for non-medical home care services?

R    No.

Q    Do you know if there is any entity that certifies non-medical home care health services providers?

R    No.

Q    Do you know if there is any entity that regulates non-medical home care health services providers?

R    No.

Q    Have you ever been involved in providing non-medical home care health services?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                40

R   Please clarify question.

Q   Have you ever been involved, have you ever provided to a patient at his home non-medical home health care services?

R   Could you clarify this?

Q   No, I cannot clarify this anymore.   You can't answer?

R   Well, then, I can't answer it.

Q   Going to the report.   Does it contain a complete statement of all opinions that you will express at trial and the basis and reason for them?

R   Yes.

Q   Does it contain all the facts or data considered by you informing the opinions?

R   Yes.

Q   Does it contain any exhibits that will be contained to summarize or back up your opinion?

R   Exhibits.  Clarify that.

Q   Any demonstrative evidence in order to show your opinion.  Does it contain them?

R   Your question is vague.  I don't understand it.

Q   It is very specific.   That is what the rules says.  Does it contain any exhibits that will be used by you to summarize or form your opinion?

R   Do you mean…

Q   Any kind of exhibits.  Drawings, pictures?

R   No.

Q   It does not contain them.

R   No drawings or pictures.

Q   Thank you.

ATTY. VIVAS:

This is Hector Vivas for the record.

Q   Doctor, I know that you are considering taking the Boards as you testified before.  But have you taken any Board exams previously?

R   No.

Q   Doctor, you told us what you did in your home office but I don't think you told us what you do at your office at Medico del Este?

R   I treat patients.

Q   To which hospitals do you take patients, do you refer patients to right now?

R   Right now Humacao is semi shut down so I am not doing too much there and Caribbean is localized enough. Due to the recent legal problems I do not prefer to take patients right now.  So right now I am not giving surgery to patients until this has been clarified.

Q   And if you are not doing surgery right now do you still see patients in Edificio Medico del Este?

R   I stopped seeing patients last week because I

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    42

couldn't provide surgery.  I was referring them.

Q   You have not performed surgery in how long?

R   Currently it is about six months.

Q   Do you practice any other type of surgery during these past six months?

R   No.

Q   So you have not seeing patients in the last six months?

R   Until I clarify this, no.

Q   Doctor, in the 22 cases that you have been sued for medical malpractice, you stated that you settled two of them?

R   Yes.

Q   If you get an adverse judgement did you lose any of those cases?

R   I  lost  one  case  that  was  reviewed  by  the appellative courts and I won that.

Q   So you have won 20 cases instead of two and you have two pending?

R   Yes.

Q   Doctor, have you ever appeared before la Junta de Licenciamiento what used to be the Tribunal Examinador de Medicos?

R   No.  No, that is not correct.  I went once but the complaint was set aside because the person never went

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

43

to the Board.  I went again and then it was set aside.

Q   And regarding the cases that are for $90,000 you have not been summoned to a appear before the Junta de Licenciamiento?

R   No.  I  submitted  what  happened  and  they understood.

Q   Let's be clear.  Did you receive an order by the Junta  de  Licenciamiento  regarding  that  case  in  that settlement?

R   No. I spontaneously wrote a description of what had occurred and why I was settling.

Q   So you voluntarily addressed the Junta…

R   Yes.

Q   Without any order by them or request for hearing?

R   This  is  a  radiation  induced  enterocolitis  and this  and  this  and  this  and  I  was  informed  that  the business decision is best to settle it.

Q   Doctor  do  you  have  any  privileges  to  practice medicine in internal medicine?

R   No.

Q   Do  you  consider  yourself  an  expert  in  internal medicine?

R   No.

Q   Will  you  testify  or  try  to  testify  in  this  case as an expert in internal medicine?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                44

R   No.

Q   And in your teaching appointments none of them have been in the field of internal medicine?

R   No.

Q   Your publications and presentations none of them have been in internal medicine?

R   No.

Q   Doctor, to which professional associations, if any, do you belong to?

R   American College of Medicine that is voluntary and the Colegio de Médicos de Puerto Rico.

Q   American College of Medicine?

R   Yes.

Q   You don't belong to the American College of Surgeons?

R   No.  You have to be a fellow.

Q   And you are not a fellow?

R   No.

Q   Have you referred patients to home care?

R   Yes.

Q   Once you refer the patients to the home care the treatment is given by the home care personnel, right?

R   Yes.

Q   Not by you?

R   I have to sign a follow up on my patients.

*Carlos Bolívar Guillén*
*(...) Audio Ininteligible*   Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                45

Q    But the treatment and the visits are done by the home care personnel?

R    Yes.

Q    You do not participate directly on that.

R    In only one case.

Q    Who is better trained to treat a patient with diabetes?  An expert in internal medicine or a surgeon?

R    I think that is a question that…  It all depends on the training.

Q    Who is better to treat a patient with diabetes? You or an expert in internal medicine?

R    Internal medicine.

Q    Who is better trained to treat a patient with renal disease, N-stage renal disease, an expert in internal medicine or yourself?

R    A nephrologist.

Q    Who should treat a patient with cardiac failure?

R    Depends on the degree.

Q    If it's severe.

R    Cardiologist.

Q    A patient with morbid obesity?  Should you treat him or should it be another specialist?

R    Morbid obesity is treated currently by surgeons working with dietitians and it is a complex problem.

Q    But who is better prepared?  The surgeons?

R    Surgeons.

Q    And a patient with respiratory failure?

R    Pneumologist.

Q    If you have a patient with any of these conditions that I have mentioned you refer him to the specialist that you have mentioned?

R    I consult him.

Q    Which is basically a referral right?

R    Referral you send the patient to them and basically if it is at our hospital settings I consult.

Q    And if it is in an office setting?

R    If an office setting I refer them for his opinion.

Q    Do you know if the patient in this case has all the conditions that…

R    Yes.  He was described as diabetic, N-stage renal disease, morbid obesity and with multiple abdominal surgeries.

Q    Cardiac failure too?

R    Congestive heart failure.

Q    And hoe about respiratory diseases?

R    That one I am not sure.

Q    You don't remember?

R    Don't remember.

Q    Do you know if he was treated by (.)?  In several

of the admissions?

R   During the hospital… Yes.

Q   For risk of respiratory failure?

R   yes.  Second admission.

Q   Do you know whether before these admissions the patient had that condition?

R   No.

Q   You don't know that because you haven't seen the records.

R   No.

Q   Thank you.

Q   Doctor, do you know if CMS, Medicare have a definition for non-medical home care services?

R   I understand they have but I am not versed in it.

Q   So you cannot give us a definition of what home care services are?

R   No.

Q   Thank you.  I am done regarding your qualifications.

GONZALEZ VILLAMIL:

Q   Doctor do you consider yourself an expert in non-medical home health care services?

R   Can you clarify the question, again.  I don't understand the question.

Q   Do you consider yourself an expert in providing

home care services?

R    No.

Q    Doctor when did you begin this process of trying to get board certified?

R    I decided to this about eight months ago.

Q    More or less at the same time that you have not been doing any services?

R    Prior.  I wanted to go into local (.).

Q    What is that?

R    That is a practice in the United States that you do (.) for surgeons on the United States.

ATTY. RUIZ COMAS:

In the continental United States.

R    In the continental or Canada.  I have done it twice and it is easier and they pay more if you have your Boards.  And I have always decided that some time in my profession I was going to sit down and take my Boards. So, I am winding down my caseloads.  I like this local stenis so I decided to sit down and talk to my wife and says I am going to wind down and I am going to do this.

ATTY. GONZALEZ VILLAMIL:

Q    At the present time how many hours are you at an average looking into this process of getting prepared for this?

R    For this?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                           49

Q   Yes.

R   I wake up every morning at 6:30 start from 7:00 until 3:00 pm.

Q   Thank you.

                          OFF THE RECORD

ATTY. RUIZ COMAS:

Q   Let's go straight to the point. First of all, you stated that an incision hernia is a common post-operative complication in 11 to 20 percent of the cases correct?

R   yes.

Q   That information you took from the medical literature or that information you took because you know that as a fact?

R   I know that as a fact and I took it from the literature.

Q   And that information will be included in the medical literature that you are going to provide us in the near future, correct?

R   Yes.

Q   Anatomical repair is associated with a recurrence rate of 23% to 50% in comparison to 1.5 to 10 with prosthetic mesh.  That information is taken from the medical literature?

R   Yes.

Q   And this statement most recurrence are at the

mesh tissue interface and not due to failure of the mesh, correct?

R   Yes.

Q   If I understand that sentence correctly it is rare that the mesh fails?

R   Very rare.

Q   And when you are saying here or you are writing here "mesh tissue interface" what is that?  Mesh tissue interface?

R   The place where the mesh is anchored to the tissue.

Q   This statement, last statement, "mesh should be treated as a foreign material susceptible to infection, sinus formation or enteric fistulization".  That is taken from the medical literature too?

R   Yes.

Q   Let's go to your conclusions. You make a reference to what happened in the case.  Do you know when Mr. Cruz Colón started to have problems with hernias?

R   He had multiple surgeries.  That is all the record says here.

Q   Multiple.  That means that you don't know since when Mr. Cruz Colón has been having problems with hernias?

R   No.

Q   Do you know when he was operated for the first

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                              51

time regarding hernial repair?

R   No.

Q   Do you know since when this patient has morbid obesity, diabetes, high blood pressure and respiratory failure problems?

R   It states that in the record.  It doesn't state when.

Q   But the answer is that you don't know since when this patient has this multi conditions?

R   No.

Q   Does any of these conditions an impact on the recovery of a patient after a surgery for hernial repair?

R   Yes.

Q   Do you know whether this patient had had an appendectomy done prior to 2015?

R   No.

Q   Do you know how frequent this patient was having problems with hernia recurrence?

R   No.

Q   Is that an important fact?

R   No.

Q   Do you know if the hernia recurrence that this patient was having, do you know what was causing the recurrence of the hernia?  Is that an anatomical problem that he has?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                        52

R    No.  It is not that.

Q    Then what causes hernia recurrences?

R    In this patient?

Q    In this patient.

R    It is a breakdown of the mesh tissue interface because he had multiple factors.  He is an N-stage renal disease patient.

Q    And how that impacts…

R    They have delayed inhaling. Plus they have an incidence of breakdown of glandules.  He is a diabetic patient.  They also have problems with inhaling.  He has congestive heart failure so he will have as part of his problem increasing abdominal pressure using his muscle to breath.  He has multiple, and I can't say for a fact, that he has respiratory problems.  And all that will all impact either through increased intrabdominal pressure or through (.) healing.

Q    Do you know how many hernia recurrences this patient had before 2015?

R    No.

Q    If the patient is recommended to do an operation for hernia recurrence and the patient does not do that and waits for more than two years to do so, does that have an impact in the case?  On the patient?  The hernia can be bigger?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

53

R   It's better if its bigger.  The dangerous hernias actually are intrabdominal ones, are the small ones that can be incarcerated. The large ones don't incarcerate. So, the large hernia doesn't bother me.  As to your question, it all depends on what was the primary indication for the surgery.

Q   Now, on your report in the first conclusion you talk about the surgical consent correct?

R   Yes.

Q   Do you have any information regarding the conversations that the patient had with the doctor, or the surgeon concerning the operation in 2015?

R   No.

Q   So you don't know the extent of what was discussed between the patient and the doctor concerning the benefits versus the risks of the operations?

R   No.

Q   So when you are stating here, seems to me that you are stating here that this patient did not have an informed consent you are just referring to the document that you saw in the hospital?

R   The document and its medical history.

Q   When you say medical history what did you refer?

R   The history that is on the record that says that he has morbid obesity, diabetic, congestive heart failure,

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

54

N-stage renal disease. Those are extremely high concurrent problems that increase the risk of the surgery.

Q    But you don't know and you don't have any evidence to establish and you don't even have evidence even to contradict this to establish that when Dr. Bolaños discussed the operation with the patient those issues were discussed.

R    No.

Q    So when you state that Mr. Cruz Colón was a high risk patient and the surgical consent was not explained by the surgeon you are basing that statement only on the review of the document in the medical record?

R    Yes.

Q    When you say that it was not signed by him you are referring to not signed by whom?

R    By the surgeon.

Q    And how do you know that it was not signed by him?

R    I looked that in the first surgery it did not have his signature.

Q    Are you sure?

R    Sure.  It was the resident.

Q    So it is your contention that the resident was the one who signed the…

R    That is what I says.

*(…) Audio Ininteligible*

*Carlos Bolívar Guillén*
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                          55

Q   And when you say in that statement, "the risk of an enteric fistula was not presented to him".  You are basing that statement only and exclusively in the document that you reviewed from the doctor?

R   Yes.

Q   Do you know how much information… Since this patient has been operated before for this condition, do you know what information the patient had concerning the benefits versus the risks of the operation?  Prior to this event in 2015?

R   Doesn't state…

Q   And you haven't seen those medical records either?

R   Correct.

Q   So it is reasonable then to assume and to state that this conclusion of yours that this patient was not properly consented is exclusively based on the information that appears on the document in the medical record?

R   Yes.

Q   You as a surgeon talk with your patients before operations, correct?

R   Yes.

Q   And the documents for the informed consent do not contain everything that you discuss with the patient concerning risks versus benefits, correct?  It is a yes or

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

56

no answer.

R    Yes.

Q    Yes what?

R    Yes I put down the risks.

Q    You put everything that you discuss with the patient?

R    No.

Q    That is what I mean.  You discuss verbally with the patients a lot of information regarding the benefits, what you are going to do, what are the risks, what might happen but the extent of that conversation is not reflected specifically in the consent, correct?

R    Completely no.

Q    Let's go to your second conclusion.  You said that, "During the second admission the patient presented with septic shock", correct?

R    Yes.

Q    When you say that, "no attempt was made to identify the focus of the infection", what do you mean by that?

R    The record is silent.  It does not say where the infection process was initiated.

Q    Do you know whether this patient was consulted to different specialists?

R    Consulted?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                                            57

Q    Yes.

R    Yes.

Q    Including an infection disease specialist?

R    Yes.

Q    So is it your contention that this infection disease specialist did not center on where the focus of the patient was?

R    Not… I am not blaming the infectious disease…

Q    I am not saying that you are blaming it.  I am just saying, you are saying that there was no attempt to identify the focus.  What you are saying here is that none of the physicians that attended the patient during that admission, that is what you are saying, didn't identify the focus of the infection.

R    They did not identify the focus of the infection. They made an intent.

Q    They made an attempt?

R    They made an X-Ray that they did not follow up on.

Q    Do you know whether a CT abdominal…

R    Yes.

Q    And the CT did suggest the place of the infection, correct?

R    Yes.

Q    Do you know whether, and you say in your report

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

58

no diagnostic or therapeutic action was taken.

R    Yes.

Q    Do you know whether in this particular hospitalization a drainage of the wound was done?

R    Of the wound?

Q    Of the liquid.

R    Of the wound but not of the abscess.

Q    How do you know it was not of the abscess?

R    Because there was not a note of the percutaneous drainage of the abscess.

Q    Do you, there is not a note in the medical record of a percutaneous drainage?

R    Yes.

Q    How do you do a percutaneous drainage?  With an abdominal sonogram?

R    It is an invasive procedure.  You can either do a sonogram guided or a CT guided.  Basically, it is an invasive radiologist.

Q    Do you know whether a sonogram guided percutaneous drainage was done in this case?

R    It is not in the record.

Q    If it was that would have been a therapeutic action taken, correct?

R    On the second admission?

Q    Yes.

Case 3:16-cv-02959-MDM    Document 79-5    Filed 05/14/19    Page 59 of 88
Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

59

R   Yes. Definitely.

Q   If it was.

R   Yes.

Q   Do you have any other, apart from what you state here do you have any other, on the second admission on the one of 8-11 to 8-27 do you have any other complaints or any other findings regarding departure of the standard of care?  Apart from what you say here?

R   Yes, he was discharged with a fever.

Q   Apart from what you say here.

R   No.

Q   He was discharged with a 38.3.

R   That is a significant fever.

Q   When did the patient return back to the hospital?

R   He comes back on the 30th.

Q   When he comes back, he comes in with an enteric fistula?

R   Fistula, yes.

Q   And is that a complication of hernia repair?

R   It is a complication of hernia or bowel surgery.

Q   So that can happen in, that is expected to happen, it might happen?

R   Yes.

Q   So the fact that the patient had an enteric fistula is not a deviation of the standard of care?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                         60

R    No.

Q    Are enteric fistulas treated with medical management rather than surgical management initially?

R    Yes.

Q    So to treat an enteric fistula medically with liquids and antibiotics is correct according to the standard of care?

R    That is incorrect.

Q    So tell me why.

R    You have to establish why you have the fistula first.  If you establish that the fistula is secondary to an obstructive process you can treat him with all the TPN you want, the fistula will not go away.  If you establish that the fistula is due to a foreign body reaction the fistula will not go away with TPN.  If you establish that the fistula is due to radiation injury, the fistula will not go away too.  So the first action that you have to do is why do I have this fistula.  After you establish why you have the fistula and you believe it is due to a breakdown of the bowel or an area, then you can treat him like you have stated, with TPN.

Q    Then you can treat him…  I'm sorry I didn't hear the last part.  Can you tell me again?

R    Then you can treat him with Total Parenteral Nutrition.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    61

Q   So if you treat the patient with Total Parenteral Nutrition, that would be according to the standard of care?

R   If you have established previously why he has the fistula.

Q   And what would be the situations that you can treat a patient with TPN and not surgically?

R   Initially, this case.

Q   When or at what point in time in this particular case there was a change in which you understood that the patient had to be surgically operated?  At what point in time?

R   Despite TPN patient a high output, that continued with high output and the fistulogram and the abdominal films persisted with accumulation of contrast material in the area from where the fistula was draining.  That means that the patient has an abscess in that area and it will not heal until you treat that.  You can treat that initially if you want and you believe that it is not a breakdown of stenosis with drainage procedure, percutaneous drainage of the abscess.  Failing that then you would have to do an extremely aggressive surgery and by extremely aggressive you have two options.  You can go in and do a bypass of that area so that area will heal because nothing else goes down. Or you can do an open vac

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                              62

type repair that you open up the abdomen, you repair it you leave open, you put what is called a bag system and then you clear the area and then it heals and then you do your repair. They are both very aggressive. This patient for a long period was continuous high output, his continuous presence of foreign contrast in that area precluded that he would not heal. That fistula would not heal.

Q   What are the risks of conducting an aggressive enteric fistula repair?  In a patient like this.

R   I think the question would be what are the risks of not doing this?

Q   Yes but that is not what I asked.  What I ask you is tell me what are the risks of conducting an aggressive surgical intervention in a patient with all these medical complications?

R   They are high risks.

Q   Is it your contention that when a surgeon operated the patient and used the Phasix Mesh…

R   Yes.

Q   Using the Phasix Mesh was a according to standard of care?

R   That is the correct…  Yes.

Q   The problem you have according to what you state in your report is that he should have taken the previous

mesh out, correct?

R   Completely. All of it.

Q   In the same operation?

R   Yes.

Q   Is there any particular reason why you leave the original mesh in the abdominal cavity?

R   No.  If you are going to put in a Phasix mesh no because then you are defeating the purpose of a Phasix mesh.

Q   And your conclusion that the previous mesh was in the body is due because of the radiological findings?

R   In his statement in the operative report he says in the right lower abdominal he repaired an anchored the previous mesh.  I would have taken it all out.

Q   You would have taken it out.

R   I put that Phasix mesh that is a standard.

Q   I understand but that means that that is a clinical judgment of the surgeon?

R   Not if you are using a Phasix mesh.

Q   So the standard of care according to you, the standard of care would have required that if you are going to put a Phasix mesh that you have to take out the previous mesh?

R   Yes.

Q   In all cases.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                    64

R    In all cases with multiple abdominal recurrence, yes.

Q    And do you have any medical literature…

R    Yes.

Q    And that medical literature will be included in the one you put in the …

R    Yes.

Q    Good.  We can read it and then maybe we can ask you some questions.  In this particular case, is it your contention that the patient was not healing with TPN because of malignancy?

R    No.

Q    So that is taken from the list.  Was it a distal obstruction of the fistula?

R    No.

Q    Was it a radiation injury to the bowel?

R    No.

Q    Was it inflammatory bowel disease?

R    No.

Q    Was it an alter wound healing?

R    He has an alter wound healing and an active abscess with possible foreign body reaction.

Q    So of those two which is the most likely that you understand was the cause of the enteric fistula?  The active abscess…

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    65

R    With foreign body reaction.

Q    When you have an active abscess with possible foreign body reaction do you treat that with antibiotics?

R    No, I drain it.

Q    But do you drain it and then continue with antibiotics?

R    Yes.

Q    Does an active abscess with possible foreign body reaction an expected complication of hernial repair?

R    It can be a complication.

Q    Now you say in number 4, the surgical procedure performed… Strike that. Apart from that you stated in number three concerning the hospitalization of, that would be 8/30 of 2015 do you have any other findings or complaints regarding the treatment provided to the patient in the hospitalization?

R    No, he was treated with TPN.  My complaint is that he should have been in this damage control surgery…

Q    I understand that.  But apart from that.

R    No.

Q    The consultations were proper, the medical management was proper, the consultation to the physicians was proper?

R    Yes.

Q    Now, you stated in number 4, that in the

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                              66

hospitalization, you stated in number 4 that there was a medical procedure performed in 9/30/2015?

R    Yes.

Q    But in the medical records that you… That would be in the hospitalization of August 30 to November 3 correct?

R    Yes.

Q    In that, you say that in that surgical procedure performed has no indication, why?

R    They did a fistulogram and debridement of the fistula.

Q    A Fistulogram and a what?

R    Debridement of the fistula.

Q    What do you do that for?

R    I wouldn't have done it.

Q    I am not asking whether you would have done it or not. What I am asking is why do you do that? What is the purpose of you doing a fistulogram and a debridement of the fistula? What is the purpose of doing that?

R    Excuse me, but that is the question. There is no indication in this patient.

Q    I understand but assume for a fact that that was done in this case.

R    Yes.

Q    Why would you do that?

*(...) Audio Ininteligible*

*Carlos Bolívar Guillén*
Traductores y Taquígrafos
787-720-2365

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                           67

R    I wouldn't do it.

Q    I know, but if you are going to do it why?  What is the purpose of it?  What do you get by doing that?

R    That is my answer.  It is not indicated.

Q    Ok.  Let's go now in general sense.  Why do you do a fistulogram?  What for?

R    A Fistulogram?

Q    What is the purpose of a fistulogram?

R    You used to do that to identify the area from where the fistula was coming.

Q    In that particular case would you have done a fistulogram to specifically know the area from where the drainage was coming?

R    No.  The CT had already identified it.

Q    So the CT is the goal standard to identify it?

R    Currently this CT done twice would establish that.

Q    So you understand that the fistulogram was like redundant because you already knew where the…

R    I find no indications for it.

Q    And you say that he did a debridement…

R    Debridement of the fistula.

Q    And how do you do that?

R    You take the tissue.

Q    From where?

R    From the area of the fistula.

Q    And is that like a biopsy?

R    No it is not a biopsy.

Q    So what do you do that for?

R    I wouldn't do it.

Q    I know. But what is the purpose?  It is obviously a medical procedure that is done.

R    Yes.

Q    If you are going to do it what is the purpose of doing it?  What are you going to gain by doing a debridement of the fistula?

R    But you are asking me something that I am very imminent in telling you it has no indication, I wouldn't do it.

Q    I know.  In general..

R    So I can't find indications form something that I can't find indications.

Q    What are the indications to do that?

R    To do that?  A debridement?

Q    Yes.

R    A debridement of the fistula?

Q    Yes,

R    That you have a non-healing ulcer.

Q    Anything else?

R    Non-healing ulcer or you are not sure that you

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                 69

are not dealing with inflammatory bowel disease.

Q    Anything else?

R    If you believe that at the end of the fistula you have foreign tissue.  You have a foreign body.  That is basically it.

Q    And in this particular case that was a suspicion that he had a foreign body?

R    No.   Not at the end.   Not at the level of the skin.

Q    Is a debridement a less invasive procedure than a full surgical intervention?

R    Yes.

Q    Is it your contention that the performance of  a fistulogram  and  the  debridement  of  the  fistula  is  a violation of the standard of care?

R    I had no indication.

Q    That is not my question. My question is whether performing that is a violation of the standard of care?

R    Yes.

Q    Do you have any reference that will support your statement that performing a fistulogram and a debridement of the fistula in this particular case will be a violation of the standard of care?

R    No.

Q    So that is your opinion?

R    My opinion.

Q    Now when you say that the patient… strike that. When you say, "at this time an aggressive fistula repair was required".

R    Yes.

Q    You are referring after the fistulogram and the debridement of the fistula was performed?

R    No, at the time that it was performed.

Q    At the time that it was performed.  You would have said that instead of doing a fistula debridement you would have done a fistula repair on 9/30?

R    If I am going to submit a patient to the risk of anesthesia and at this time he has been a month with a fistula, I would have done a complete surgical takedown or if I don't feel that I have the knowledge to do that, and I accept that, I would have referred him to Centro Médico where this is done.

Q    Let me ask you this. Do you agree that other surgeons would not have performed on this particular case with this patient's condition the surgical repair that you are suggesting that should have been done?

R    Which surgical the initial?

Q    No, when you say that you needed to do an aggressive fistula repair.  Would you agree with me that in the surgical community not every surgeon would have

done that that you are suggesting?

R   Not every surgeon has the skill to do it.

Q   That is not what I am asking.

R   It is what is required.

Q   So is it your opinion then that if the surgeon has the skill to perform this, all surgeons that have this skill would have done that?

R   Yes that would have done that.

Q   And that would be a standard of care according to you?

R   Yes.

Q   And there would be no disagreement among those surgeons as to the manner of treatment of that condition?

R   No.

Q   And that would be supported by the standards of the American Board of Surgery?

R   Yes.

Q   And do you have those?

R   Yes.

Q   Can you produce those?

R   Yes.

Q   Thank you very much. When you say that the patient was discharged with leukocytosis and fever. How much fever did he have?

R   I don't have the record, but he had fever.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                                        72

Q   And what was the degree of the leukocytosis?

R   I don't have the number right now.

Q   So, in sum your statement against the surgeon here in this particular case is that he violated the standard of care because he did not consider or performed a surgical fistula repair?

R   That is incorrect.

Q   So what would be then the…

R   Violation?

Q   Yes.

R   All of them?

Q   Yes.

R   First, I would not have operated on this patient. He is extremely high risk. The risk was extremely great. What was his only advantage? A big hernia that you can manage with an abdominal binder that has all the risks of multiple reoccurrence, all the risks of associated diseases and what is the benefit I am going to give it. That he doesn't have a hernia?  He is 68 years old with N-stage renal disease.   I would just put an abdominal binder. But going into if I do the surgery with a Phasix mesh that is a correct mesh to use in this patient, I would have taken all out, all the material because if not then I defeat the purpose of the phasix mesh.  A Phasix mesh is a prolangerant of collagenous material that after

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                73

six months it is absorbed and you get a film. You no longer have a mesh you have a buildup of collagenous tissue that acts like a wall.  To put it in correctly you have to take all the tissue out, inflammatory tissue, you have to anchor it subfacia, it was anchored and then you can have a lower recurrence of hernia.  They are extremely expensive but it is indicated to use them in this case if you do the surgery, I wouldn't have done it.  If you take out all the foreign material and he develops and enteric percutaneous fistula you know that he doesn't have a foreign body reaction because the mesh will dissolve and it will not produce a foreign body reaction and end the fistula and I have seen them, they will heal.

        Q   Bu themselves.

        R   By themselves if you treat them with TPN.  So that is another problem.  He defeated his correct actions of taking a Phasix mesh putting it in correctly.  Second, he discharged the patient with fever, 38.3 is not a laughing matter. He discharged him home with that fever. Patient came back immediately with a fistula. He did not take heed of a CT report saying there is a suggestive abscess formation on the right lower quadrant. There is no mention on the record of management of that. You state that I would have to say I hadn't seen it, a sonographic…

        Q   I haven't said anything. Don't worry about it.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                74

There will be time for that.

R   So then this patient goes into a TPN treatment but he has to say when will this stop.  When is the moment, I have a high output fistula, that is over 750cc per day.  I have to see that it is going down. That I have become to have effective wound healing…

Q   At any point did it start to come down?

R   It never came down. He was discharged and immediately went into dehydration. Although the fistula was going down he couldn't follow healed (.).  It never came down to 30 millimeters, 60 millimeters per day. It never came down to that.  It was a high output still. So I believe that despite all the initial, the I wouldn't have done the surgery, the Phasix mesh was put in incorrectly and al that there had to be a moment of reckoning that this patient had to have an aggressive, his only option for life. You are talking option for a life at that moment. He had to have some type of aggressive surgery. At the minimum you did a bypass.  Just do a surgery, just do an incision take a portion of the bowel proximal to the fistula and you now have a formal ileostomy. That is done. And the patient would have healed distally. If he would have had a formal ileostomy, probably never would have sealed it after that but it would have healed.  Or you can do aggressive reconstruction.  But the day 9/30/2015 he

Case 3:16-cv-02959-MDM    Document 79-5    Filed 05/14/19    Page 75 of 88
Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

75

had to decide which way he was going. That is my contention. As a surgeon, second, I would not have discharged this patient…

Q   Yes, I understand.

R   …to a nursing home. I believe he is a patient with too many heavy conditions to be actively and timely managed in a nursing home. You have to understand the limits of a nursing home care.

Q   Yes, but I am not asking you about that. If you want to talk about the nursing…

R   I am just saying that I would not have made the decision of discharging him…

Q   I understand that. You are claiming also that you would not have discharged the patient and send then to home care?

R   No.

Q   Anything else?

R   That is about it.

Q   Thank you very much. No more questions from me.

ATTY. ESTRELLA:

For the record Mayra Estrella. Just to clarify, doctor, regarding the second admission of August 11, 2015 it would be right to say that the patient was treated for the septic shock and when he was discharged he was stable? He didn't have septic shock?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                76

R   No he wasn't stable.

Q   He didn't have septic shock, correct?   He had normal lipocytes?

R   No, he was septic. He had 38.3 fever.

Q   Doctor, when the patient was discharged on August 27 do you have the value of lipocytes that he had at the moment?

R   He wasn't elevated but he had a fever.

Q   He didn't have elevated lipocytes?

R   Yes.

Q   And when he returned on August 30 he didn't have a complaint of fever and they didn't report the patient had fever when he arrived?

R   No.

Q   He didn't have?   That is your answer?

R   No, they didn't record fever.

Q   And he didn't have a complaint of fever?

R   He didn't complain of that.   He was discharged.

Q   But my question is…

R   He didn't complain of fever.

Q   And he had normal pulse and he had basically normal blood pressure, correct?

R   Yes.

Q   And you already clarified to questions of Atty. Ruiz Comas that you don't have a finding against the

infectologist that treated this patient of the admission of August 11, 2015?

R   No.

Q   Do you have a complaint or any findings regarding any other of the consulting physicians during that admission of August 11, 2015?

R   No.

Q   I am going to ask you the same questions to the next admission which was on August 30, 2015.  Do you have any complaint or finding against any other physician that treated Mr. Cruz Colón during that admission?

R   No.

Q   I have no more questions for the doctor.

ATTY. VIVAS:

Can we have a very brief recess so that I can consult my client?

RUIZ COMAS:

Yes.

                    OFF THE RECORD

ATTY. VIVAS:

Good afternoon doctor.  Hector Vivas for the record.

Q   Doctor as you are aware I represent Dr. Aurelio Collado who is a specialist in internal medicine.  Do you have any findings as to the breach of standard of care as to Dr. Aurelio Collado as to this patient?

R   The record states that Dr. Bolaños and Dr. Collado accepted to manage this patient at the nursing home and supervise that when he was discharged.  The patient returned in extremely septic conditions and the records that I was submitted from the nursing home have no evidence that they supervised or evaluated that patient at that time.

Q   Where did you get the information that Dr. Aurelio Collado had the obligation, that he had to supervise the home care treatment?

R   The discharge note from the hospital by the resident says that Dr. Collado and Dr. Bolaños accepted to supervise the management of this case at the nursing home. That is the extent.

Q   And in such note you state that it states that Dr. Collado accepted to supervise the home care?

R   Yes.

Q   Is that the way home care treatment works?

R   I don't know.  In this specific case I can only state from the record that this is clear that the resident in this discharge note specifies the name of Dr. Bolaños and Dr. Collado as the supervising physicians in the management of this case at home.

ATTORNEYS DISCUSS DATE OF DEPOSITION OF PREVIOUS DEPOSITION OF RESIDENT

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                            79

ATTY. ESTRELLA:

We have a date for the deposition. I think that we figured out the Yadiel or Ariel, remember the name that we were discussing at the last deposition that is the name of the resident.

ATTY. VIVAS:

Let's do something. I don't have that many more questions. Let me pose a couple of them and then while other counsel poses questions I can look for that.

Q   Do you know, doctor, who was the primary physician in the medical card of the patient?

R   What do you mean medical card?

Q   The Reforma Plan who was the primary physician?

R   No.

Q   Doctor, you stated that the resident states that Dr. Collado and Dr. Bolaños would supervise the home care. Let's state that as true. Can you state that any specific reference that states that by not giving any treatment to the patient at home care by Dr. Collado was a breach of the standard of care?

R   I don't understand the question.

Q   Okay. I'll do it again. Can you give us any specific reference as to what standard of care was breached by Dr. Collado by not visiting the patient in home care?

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    80

R   The record at the nursing home does not say if he visited or not.  I don't have many notes.

Q   I don't think we are understanding each other. I am referring my questions to the standard of care. A specific reference, a specific guideline, a specific medical authority that would state that Dr. Collado breached the standard of care by not physically visiting the patient, home care.

R   I don't say physically visiting.  I am saying that the record says that he will supervise and I found no instance either visiting or written of supervision.  So, I cannot state that there was this supervision.

Q   And as you mean that there was no supervision by Dr. Aurelio Collado as to the home care treatment, can you state any specific reference that states that he breached the standard of care by doing so?  Or by not doing so?

R   I have not stated that he did not supervise.  I state again, the record does not provide evidence either written that he visited or that he wrote of the supervision. He self-appointed a standard, not himself, the resident states clearly that he has accepted this self-appointed task of supervising home visits. How he plans to the do supervision it is not stated in the record.

Q   So the truth of the matter is that he did not

*Carlos Bolívar Guillén*
*(...) Audio Ininteligible*    Traductores y Taquígrafos
787-720-2365

Case 3:16-cv-02959-MDM   Document 79-5   Filed 05/14/19   Page 81 of 88
Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018

81

state as a fact that Dr. Aurelio Collado breached the standard of care, the accepted standard of care in this case?

R   I cannot state as a matter of fact that there was supervision.

Q   But I am not referring to supervision.   I am referring to the standard of care.  You cannot state that Dr. Aurelio Collado…

R   I do not know what standard he used for supervision.

Q   Not what standard he used, what is the acceptable standard of care in the medical references.  You don't know that?

R   Supervision means you see the patient and you follow what is going on.  But the record is silent of that.

Q   You said that 20 times doctor but I don't think we are… Can you state specific reference that says that Dr. Aurelio Collado had a duty to supervise this patient? Forget about what the resident said.  As standard of care in the American College of…

R   That is nowhere written.

Q   Nowhere.  Okay.  And let's assume for discussion purposes that Dr. Aurelio Collado had a duty to supervise the home care.  How did that lack of supervision as to the

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                    82

7 days of home care treatment contribute if in any manner,
to the patient's demise?

        R    Completely.

        Q    Why?

        R    The patient had a percutaneous fistula.  One of
the problems that you have is that they will go into
liquid…  They have a large output for the fistula.  So,
you have fluid imbalance. If you are not on top of that
you will develop a fluid imbalance and you will develop
sepsis and an electrolyte imbalance.  Frankly, and I will
state again what I stated before.  This patient should not
have been sent, I would not have sent him to simplify them
to home care. That is impossible. The patient had a
fistula output of over 500 cc.  You have to monitor them
daily.  How much is he putting in, how much am I giving to
him. How is the electrolytes. That is a hospital based
patient. It is physically impossible to manage him at
home.

        Q    So your issue is not really whether he was
supervised, the treatment by the home care was supervised
or not but it is that he was discharged. That is your
issue?

        R    No. My issue is that he accepted to supervise
this and I state this based on the resident and that I
cannot follow that he did supervise him. If he was

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                83

supervising him after the first day or the second day he would have sent this patient back to the hospital.

Q   Now I don't have any question but I reserve the right to check the document and get back to you.

R   Yes.  It is quite clear.

Q   We'll see.

ATTY. GONZALEZ VILLAMIL:

For the record, Atty. José Arturo González Villamil.

Q   Doctor, after giving your testimony regarding the condition of the patient or the treatment that the patient had received up to November 3, 2015 all the complications he had developed during the different hospitalizations his condition from November 3, 2015, would it be correct for me to say that sending him for home care at that time and at that moment and according to what you have stated more likely than not this patient was going to die within a short period of time?

R   He shouldn't have been sent for home care.

Q   So would you agree with what I said?

R   Yes. I think sending him to home care contributed to his death.

Q   And for sure the usual home care that could be provided to the patient it was not going to get him stabilized nor improve his condition?

R   I don't know how home care accepted it.

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                 84

Q   You don't know how he was accepted?

R   This patient?

Q   Yes.

R   There is no way that he should have been accepted.

Q   Do you know how, who made the arrangements for this patient to go to home care?

R   It was a social worker but I don't have her notes.

Q   Do you know what kind of services were specifically requested from the home care?

R   The only thing I know based on the resident's notes that it was contingent on the supervision by those two physicians.

Q   That is not my question. Did you read the medical record of the home care?

R   Yes.

Q   From there did you find out what kind of services were requested for the home care?

R   Wound care.

Q   Anything else?

R   No.

Q   How many times a week were the nurses supposed to go and visit the patient?

R   I don't remember that exactly.

Q   You don't remember?

R   No.

Q   When were the services supposed to start?

R   At the time of discharge but they are not in line with the patient.

Q   When were they supposed to start according to the records?

R   No, I don't remember exactly.

Q   Are you aware that the patient was discharged on November 3, 2015?

R   Yes.

Q   And that the first visit by the nurse was on November 4, 2015?

R   I think it was on the 7th.

Q   Did you read the records of the home care carefully?

R   Yes.

Q   You read them carefully?

R   Yes.

Q   Doctor, referring to page 23 of the record…

R   On the 4th.

Q   On the 4th. So, the day after he was discharged the nurse went for the initial evaluation, correct?

R   Yes.

Q   Would you please tell us how many times the nurse

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                86

had to go to the home care?

R   I don't know that.

Q   How would a nurse determine if a patient is septic?  What are the symptoms and signs of sepsis for a nurse to be able to tell that a patient is septic?

R   Fever, local cytosis, dehydration but I don't expect this from a nurse. The observation is here is geared to wound care.

Q   Do you agree with me that in this case the nurses from San Lucas Home Care performed what they were supposed to do and complied with what was required from them?

R   Complied with his wound healing, yes.

Q   And that is what was required from them, correct?

R   I don't have that from the social worker or…

Q   Forget about the social worker.  According to the papers at the home care…

R   Wound healing.

Q   So specifically you cannot say that the personnel from the home care did not perform what they were supposed to do.

R   No because and I cite, "Patient's TPN was changed, managed the medication and we are waiting for the surgeon's evaluation".  So, they were managing the TPN and the medication.  That is the note.

Q   And you have no complaints regarding that?

R   I have again, the nurses are managing this and it clearly states that the surgeon has not evaluated the patient.

Q   But I am not talking about the surgeon.  I am talking about the nurse.

R   Wound healing I have no complaints.

Q   So you have no complaints regarding the nurses?

R   no.

Q   Do you have any complaints regarding the personnel from san Lucas home care?

R   Which personnel?

Q   The personnel that went to the home?

R   As to nursing home care no.

Q   And that was what they were supposed to do correct? According to the documents that you reviewed?

R   To the aspect of limited yes.

Q   In order for me to be clear as part of your opinion you don't have any complaints regarding any deviation from the standard of home care by any of the personnel of the San Lucas Home care?

R   The nursing personnel no.

Q   Did any other personnel deal with the patient?

R   That is the only personnel identified.  The nursing.

Q   Then all the personnel of San Lucas Home care who

Neida Cruz vs Hospital Episcopal San Lucas
Dep.: Dr. José Ortiz Feliciano
May 2, 2018                                                                88

went and provided home care you do not have any complaints regarding any deviation from the standard?

R    No.

Q    Thank you. I don't have any more questions.

ATTY. VIVAS:

I don't have no more questions.

ATTY. RUIZ COMAS:

Anybody else?

ATTORNEYS:

No.

                    END OF THE PROCEEDINGS